IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| KRIS A. ZIMMER, | * | |
| | * | |
| | * | 4:04-cv-00542 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THE TRAVELERS INSURANCE CO.; | * | |
| ST. PAUL TRAVELERS COS. INC.; | * | |
| CONSTITUTION STATE SERVICES, | * | |
| LLC; THE CONTINENTAL INSURANCE | * | |
| CO. a/k/a CNA; and WELLS FARGO & | * | MEMORANDUM OPINION AND |
| COMPANY, | * | ORDER ON CROSS MOTIONS FOR |
| | * | SUMMARY JUDGMENT |
| Defendants. | * | |
| | * | |

Before the Court are two motions for summary judgment. On May 5, 2006, Defendants

Wells Fargo & Company ("Wells Fargo"), St. Paul Travelers Companies, Inc. ("St. Paul"),

Travelers Insurance Company ("Travelers"), and Constitution State Services ("CSS"), filed a

Motion for Summary Judgment (Clerk's No. 72). On May 8, 2006, Defendant Continental

Insurance Company, a/k/a CNA ("CNA") joined in the other Defendants' Motion for Summary

Judgment (Clerk's No. 77). Also on May 5, 2006, Plaintiff Kris Zimmer ("Zimmer") filed a

Motion for Partial Summary Judgment (Clerk's No. 74). Defendants resisted Zimmer's Motion

for Partial Summary Judgment on May 26, 2006 (Clerk's No. 87) and Plaintiff replied (Clerk's

No. 92). After being granted an extension of time, Plaintiff filed a resistance to Defendants'

Motion for Summary Judgment on June 9, 2006 (Clerk's No. 94). Defendants did not file a

reply brief. A hearing was held on the motions on September 14, 2006. The matters are fully

submitted.

## I.  FACTUAL BACKGROUND

Kris Zimmer ("Plaintiff") filed the present action on June 22, 2004, in the Iowa District Court in and for Polk County, Iowa.  Travelers Insurance Company and Constitution State Services removed the matter to federal court on October 5, 2004, on the basis that all parties are diverse and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.  Plaintiff filed his First Restated Complaint and Jury Demand on October 8, 2004, alleging that during his employment with Norwest Financial, n/k/a Wells Fargo, in June 1999, he sustained an injury properly compensable under Iowa workers' compensation law.  Plaintiff asserts that Defendants improperly denied his workers' compensation claim and that such denial constitutes bad faith under Iowa Code Chapter 85.

### A.  *Facts through August 3, 1999*

Plaintiff Zimmer was born March 6, 1960.  He obtained an associate in applied science degree in electronic engineering technology in 1983.  In 1988, Plaintiff had surgery for a work-related injury with a prior employer.  The surgery, performed by Dr. William Boulden, consisted of a decompression laminectomy and fusion.  Complications in the surgery resulted in partial damage to Plaintiff's S1 nerve root.  Dr. Boulden rated Plaintiff's impairment at 25% and recommended restrictions of no prolonged sitting or standing for longer than 30 minutes without changing position, and no bending, twisting, or lifting with his back.  *See* Pl.'s Statement of Undisputed Facts (Clerk's No. 74.2) at ¶ 3.

On July 15, 1996, Plaintiff commenced employment installing computers with Norwest Financial, n/k/a Wells Fargo (hereinafter "Wells Fargo").  He continued to experience low back pain and reported such back pain to Dr. Carol Horner, his primary physician, on July 22 and

October 28, 1997.  Dr. Horner's records also reflect that she was treating Plaintiff for stress-related symptoms as early as 1987.  *Id.*  Beginning in February 1999, Dr. Horner referred Plaintiff to a series of doctors for treatment of his back pain, including a psychiatrist, Dr. Thomas Koithan.[1]  *Id.* ¶ 4.

Medical records from Dr. McGuire, a treating physician who first saw Plaintiff on March 22, 1999, note that Plaintiff had a "very lengthy history," including "a posterior fusion by Dr. Boulden in 1988."  Joint App. at 39.   "He is now having increasing problems with back and leg symptoms . . . .  Back in the 80s he apparently had some problems with weakness in the left leg.  After surgery that all basically resolved and now it has come back again."[2]  *Id.*  On March 24, 1999, Dr. McGuire indicated that he had reviewed an MRI scan of Plaintiff and found it to be "a pretty reasonable looking MRI scan."  *Id.*  Dr. McGuire concluded that "there is no logical surgery for [Plaintiff]."  *Id.* at 38.

Medical records from Dr. Igram, a provider that Plaintiff saw on May 17, 1999, stated

---

[1] The record is somewhat unclear as to when Defendants received Dr. Koithan's records, but it appears to have been after Defendants initially denied benefits to Plaintiff on August 3, 1999. Regardless, Dr. Koithan conducted an initial evaluation of Plaintiff on February 8, 1999.  Defs.' Statement of Undisputed Facts ¶ 96.  Dr. Koithan reported that Plaintiff was concerned about persons having access to his medical records, was focused on having been harassed at work by some managers, and had been taking Xanax several times a day for some time.  *Id.* ¶¶ 96-97. During subsequent visits, Plaintiff told Dr. Koithan of having been in a coma in 1999 and awaking a changed man, focused on "truth" and on ensuring that wrongs are righted.  *Id.* ¶ 100. Plaintiff spoke "extensively" to Dr. Koithan on March 29, 1999 about his back pain and previous surgery.  *Id.* ¶ 103.  The Arbitration Decision also notes that Dr. Koithan diagnosed Plaintiff on February 8, 1999 with "major depression, single episode moderate" and that Plaintiff complained to Dr. Koithan about pain in his back and difficulties with coworkers.  Joint App. at 116.  It appears that Plaintiff continued treating with Dr. Koithan until at least April 2002.  *Id.* at 120.

[2] Information from this medical record was not entered into the workers' compensation Claim Management System ("claim notes").  Rather the claim notes first reflect Plaintiff's March 24, 1999 visit to Dr. McGuire and were entered into the claim notes system on June 16, 1999.

that Plaintiff had a "lengthy and complicated history" and noted that "[t]he back problem started

in March 1999." *Id*. at 312.  After putting Plaintiff through several tests and evaluating the

records Plaintiff supplied to him for review, Dr. Igram concluded:

> I am not certain what to make of his complaints.  I did review the notes from Dr.
> McGuire.  I am not certain where the symptoms could be coming from.
> Surgically there is nothing much to offer him.  I offered an evaluation by one of
> the psychiatrists in the office.  He will think about this.  If he decides to go ahead,
> I will make arrangements.[3]

Defs.' Statement of Undisputed Facts at ¶ 38.

Dr. Stein saw Plaintiff on May 28, 1999, on referral from Dr. Horner.  *Id*. ¶ 46.  Dr.

Stein's notes[4] indicate that he saw Plaintiff on that date "for chronic low back and leg pain."

Joint App. at 314.  Dr. Stein wrote in pertinent part:

> The pain that he is having is not quite as intense as prior to surgery [in 1988] but
> it was different . . . . .  He also complains of some shooting pains down his legs as
> well. . . .  He has suffered from pain ever since [his 1988 back surgery]. . . .  [In
> October 1997] he was apparently accused of some wrong doings at work . . . .  He
> is still hassled by management . . . .  He has seen several orthopedic surgeons
> recently and had a[n] MRI of his lumbar spine performed this past year . . . .
> Neurological examination reveals an alert individual in no acute distress
> presently.  After the examination he was sweating profusely.  His gait was a little
> bizarre particularly his left leg as he walked.  I asked him to hop on either leg and
> he held onto the walls on either side to hop.  He did not fall with hopping on his
> left leg although he told me his left leg will get numb and give out on him
> momentarily and he has fallen down 3 times in the last 3 weeks.  It is a transient
> weakness that he has . . . .  The patient has a lot of symptomology but nothing
> objective on examination.  The MRI shows some degenerative disease at the L-5
> S-1 level but I think the symptomology he has is far greater than what I see on the
> films.  I spoke to him at length today.  I think a lot of his problems are more on an
> emotional basis than on a physical basis . . . .  We can consider an

---

[3] Information from this medical record was entered into the claim notes on June 11, 1999.  Joint
App. at 311.

[4] Information from this medical record was entered into the claim notes on June 16, 1999.  Joint
App. at 314-15.

electromyographic study in the future should he return.  He is a difficult case hopefully we can help him out.

*Id.* at 15-17; 315.

On June 1, 1999, Plaintiff claims to have hurt his back when he helped a consultant pick up papers that had been dropped in the street and were being blown by the wind.  Plaintiff informed his supervisor, and eventually was sent home from work.[5]  On June 2, 1999, Plaintiff presented at Des Moines General Hospital ("DMGH") for treatment.  Defs.' Statement of Undisputed Facts ¶ 5.  According to the emergency room report, Plaintiff was seen at DMGH by Dr. Javaid Abbasi.  Joint App. at 24.  The report[6] lists Plaintiff's "Chief Complaint" as a one-day history of "[t]ingling sensations on the three fingers of the left hand with discoloration on those fingers."  *Id.*  Dr. Abbasi noted that Plaintiff "[i]s remarkable for back problems" and that he had previously had back surgery.  Under "Review of Systems," Dr. Abbasi states:  "[Plaintiff] is remarkable for tingling and bluish discoloration of the three fingers of his left hand since yesterday.  The patient denied any falls or injury . . . .  He does complain of back pain, which is chronic in nature."  *Id.*  Dr. Abbasi concluded with an impression of "possible vasculitis" and notified Dr. Horner, who "present[ed] to the emergency room to assume care of the patient."  *Id.* at 25.  Dr. Horner wrote a note[7] excusing Plaintiff from work "from 6/1/99 until released due to medical illness."  *Id.* at 736.

---

[5] Defendants admit that they knew of Plaintiff's claim no later than June 2, 1999.  Defs.' Statement of Undisputed Facts ¶ 15.

[6] Information from this medical record was entered into the claim notes on August 3, 1999.  Joint App. at 316-17.

[7] Dr. Horner's note excusing Plaintiff from work was *not* received by Defendants or entered into the claim notes prior to August 3, 1999.

On June 3, 1999, Plaintiff went to see Dr. Retenmaier, apparently on referral from Dr.

Horner.   Dr. Retenmaier's report[8] states:

This 39-year old white male presents for evaluation basically for a variety of pain issues, primarily left sided leg greater than arm, as well as some recent vague discoloration changes in his hands.  He dates the onset of his problems to 1988. He apparently had an injury and developed what sounds to be radicular symptoms . . . .  He talks about basically having chronic numbness and tingling down his left leg on the posterior aspect all the way down into the foot.  He also talks about some off and on pain.  Interestingly, over time, his back pain basically improved significantly . . . .  About 2 ½ years ago, he started developing some other pain issues.  He apparently started having some pains that started in the left side of his lower back and chest and moved up into his arm.  He talks about pains that radiate up his arm up into the left side of his face and neck.  He apparently had workup at that time.  He ended up being treated for anxiety issues.  It sounds like he got better control of that.  Then since January of this year, he has had progressive worsening . . . .  He talks about low back pain that has been unmanageable.  In the past, it has always been manage[able], but has subsequently been unmanageable . . . .  Tuesday around 2 p.m., he apparently missed his Xanax, an hour late.  He developed the sudden onset of discoloration in his left hand . . . .  He also has been having a lot of anxiety issues.  This apparently has been a significant problem for several years.  About 2 ½ years ago, he apparently had stress at work and dropped 35 pounds in a quick period of time . . . .  He admits to a lot of work stress.  He readily admits to anxiety issues . . . .  He really does not describe work depressive symptoms . . . .  The physical exam today revealed . . . he appeared quite anxious.  He had great difficulty bearing weight on his left leg.  He was constantly moving about and fidgeting in the chair.  He did appear to move to the right side to take weight off his left side.  He obviously had difficulty getting up to the exam table.  I had to help him.  He hobbles on his left leg.  He has difficulty weight bearing from what presumed to be his pain . . . .  He has no classic findings of full blown dystrophy in the sense of swollen, edematous phase hands and touch-me-not type symptoms . . . .  He could not stand on his tiptoes.  How much was pain and giveaway weakness, I could not tell.  He had somewhat of a forward hunched appearance . . . .

Impressions: Chronic pain syndrome.  For the most part, I think this is going to be the primary underlying diagnosis.  As you are aware, chronic pain is basically a diagnosis of exclusion.  He has so many symptoms that it is difficult to sort through . . . .  One wonders whether he has an element of dystrophy problems as

---

[8] Information from this medical record was entered into the claim notes on August 3, 1999.  Joint App. at 317-18.

well . . . .  Given the variable nature of his symptoms and the fact that they are
somewhat unusual, I did suggest that it would certainly be reasonable to pursue
studies such as a three phase bone scan and EMG and nerve conduction velocities
of his left arm and left leg . . . .

Recommendations:  For the most part, I think that, given the severity of his
problems, his loss of livelihood, the excess anxiety issues, and the fact that he is
already on narcotics and is not functioning, I am not sure that management as an
outpatient initially is really the appropriate choice for him.  I think that
management as an inpatient in the near future would probably be most
appropriate.  As far as ruling possible objective features, we can certainly do that
in an inpatient setting rather than wait.

*Id*. at 20-23; 317-18.

On June 10, 1999, CSS adjuster Tina J. Beerbower ("Beerbower") received a call from

"Michelle" at Wells Fargo informing her of a workers' compensation claim being made by

Plaintiff.  Defs.' Statement of Undisputed Facts ¶ 12.  Michelle advised Beerbower that Plaintiff

claimed he "was coming from one office to [another] and he had parked his car and he had

confidential papers that started flying around.  He bent over to pick them up and felt pain in his

back." *Id.* ¶ 13.  Michelle advised Beerbower that she was not informed of the incident until

June 9, 1999, but that Plaintiff did tell his supervisor on June 2, 1999 "that he had hurt his back

the day before." *Id.* ¶¶ 14-15.  Michelle further advised that Plaintiff had "no vacation or

floating holidays left.  He has used all his sick time also"; that "everybody that works with

[Plaintiff] knows he has a bad back"; and that she had spoken with Plaintiff's boss, who stated:

"[H]e walks like he does any other time that he has a bad back." *Id.* ¶¶ 16-17.  Though Plaintiff

claims that he told a colleague with him at the time of the blowing papers incident that he had

hurt his back, Michelle advised Beerbower that "Plaintiff did not inform Tim E[n]os that he had

hurt his back on 06/01/99." *Id.* ¶ 18.

Beerbower testified at deposition that CSS's policy was, within twenty-four hours of receiving a claim for workers' compensation benefits, an adjuster is supposed to initiate a "three point contact," meaning that the adjuster should have contact with the employer, with the injured worker, and should begin collecting medical records from providers identified by the injured worker. *Id.* ¶ 19. Additionally, the adjuster is supposed to contact any alleged witnesses to the incident. *Id.* ¶ 20. On June 10, 1999, Beerbower contacted Plaintiff to take his statement. While a tape recording was made of the interview, it appears to have been misplaced and has been unavailable for Plaintiff's or the Court's inspection. Beerbower's notes of the interview reflect the following:

> I called and talked with IW [injured worker]. He kept telling me that he has had previous back problems and when he bent over to pick up some confidential papers off of the ground he felt a rip in his left side of his lower back. He states he takes narcotics on a regular basis for his continued back pain, but that his back is really hurting him now. He states that he informed Tim Enos that he had hurt his back when picking up the papers off of the ground. He states he was in the army from 1977 to 1983 and was also in the IA National Guard. He was discharged honorably. He states he has seen Dr. McGuire in April and has seen Dr[s]. Igram and Stein in April. He has also seen Dr. Toriello and Dr. Retenmaier along with Dr. Horner. He was seen in the ER at DMGH on 06-02-99 when he woke up that AM. He states he is taking Oxycontin, Darvoxet, Voltaren, Zanax, Prozac and Lipitor. He was taking Flexeril but had discontinued it. He states his treating doctor is Dr. Horner and he has had an MRI done this year. He states he has not had any physical therapy at this time. He states he was informed before this incident that he needs to do exercises and stretching. He states he does minor drywall repair at his home when it needs to be done. He states he makes clocks and plays cards. He walks about ½ mile a day with his wife. He states he does house repairs. He sprays his deck and will replace a gasket when it needs to be done. He states he was at home the day before the day in question. He kept saying over and over that this was the final straw that broke the camel's back. He has had a previous back injury in 1985 and had a 25% impairment rating. He worked for Allen Test Products at that time. He states Travelers settled his claim with him.

Joint App. 310, 13 (Beerbower's handwritten notes taken during interview).

Immediately after speaking with Plaintiff, Beerbower contacted Dr. Prevo, Wells Fargo's "company doctor," for purpose of scheduling an appointment for the Plaintiff "to evaluate and determine if related to his old injury or new injury." Defs.' Statement of Undisputed Facts ¶¶ 27-28. Upon contacting Dr. Prevo, Beerbower and the doctor's staff agreed that "Dr. Prevo would not be the one to see [Plaintiff] due to his comprehensive treatment and problems. [Dr. Prevo's representative] states [Plaintiff] probably should see Dr. McGuire again and have him evaluate his back." *Id.* ¶ 29. Accordingly, on June 11, 1999, Beerbower scheduled an appointment for Plaintiff with Dr. McGuire on June 14, 1999. *Id.* ¶ 30. On the same date, Beerbower contacted Drs. Igram, Stein and McGuire's offices by telephone to request medical records, and additionally made arrangements to get medical records from DMGH, Mercy Arthritis Center, and Drs. Toriello and Horner. *Id.* ¶¶ 32-33. Beerbower also interviewed Tim Enos, the witness identified by Plaintiff. *Id.* ¶ 34. While Plaintiff maintains that he told Enos that he had hurt his back bending over to pick up the fly-away papers, Enos only confirmed that he saw Plaintiff bending over to pick up papers. *Id.* ¶ 35. According to Beerbower: "[A]t no time did [Plaintiff] tell [Enos] that he hurt his back." *Id.*

Dr. McGuire's notes[9] from Plaintiff's visit with him on June 14, 1999, reflect the following:

> Kris comes in today. Apparently he had an incident approximately 6/1/99 when he was downtown and a "subordinate" dropped some very important things and he looked down and saw all these papers flying by him on the street and he went running after them and leaned over to pick [up] these things . . . . Anyway so his pain is worse. When I started to talk to him about when and how all this started his comment was that it started in September of 1997. He then went into a

---

[9] Information from this medical record was entered into the claim notes on June 16, 1999. Joint App. at 314-15.

lengthy story about an e-mail message.  He firmly believes all his back pain is related to stress relating from this incident at work in 1997.  I saw him back in March.  Apparently he saw somebody else in late May.  He then had the work incident.  He went to the emergency room.  They tell a very involved story about skin color changes on his 4th and 5th digits and his hand and those types of things . . . .

Physical Examination: Gentleman appearing basically stated age.  He sits here reasonably comfortably but he gets up with real difficulty.  He stands forward flexed, knees flexed.  His spine is almost kyphotic in the lumbar spine.  He moves about the room in a very awkward manner.

Impression:     1.     Obvious conflict at the job site
                2.     Readily admits stress with this incident at work
                3.     Documented weight loss etiology unexplained
                4.     Antecedent history of back problems from 1998
                5.     Recent history of back symptoms seen here in March of
                       1999 and they are getting worse.

Treatment Plan:  His back is the somatization of all his other problems.  There is absolutely nothing for me to do.  He needs to resolve stress and psychological problems before we can do anything.  That is far, far out of my hands.
Called and talked to Tina.  From my standpoint, as far as the spine is concerned, he can be working full time.  As far as the psychological problems and his dealing with superiors and other people, that needs to be resolved and that is in somebody else's area of expertise . . . .  As far as the back is concerned he could be working.  The psychological problems and the job conflict situation would probably prevent him from working.

Joint App. at 37; 313.

On June 28, 1999, Beerbower made an entry in the claim notes entitled "phone call from Judy," which stated:  "Judy called and states IW [injured worker] was seen on 06–02-99 and did not indicate this was work related.  Therefore they will not release the medical records to us without a written release from the IW."  Defs.' Statement of Undisputed Facts at ¶ 48.  Beerbower testified at deposition that she did not know where Judy called from, i.e., which physician or hospital employed Judy.   Joint App. at 797.  While Defendants assert that these

-10-

records could only relate to Plaintiff's treatment at DMGH and/or individual physicians who may have treated Plaintiff on that date, Beerbower testified that she had already received records from DMGH (but not necessarily from any consulting or independent physicians) on June 17, 1999, prior to the call from Judy. *Id*. at 797.

On August 3, 1999, Beerbower entered in the claim notes a "Phone call with Michelle." *Id*. at 318. Beerbower wrote: "Michelle called and wanted an update on the claim. I told her that I was still waiting on the notes from Dr. Horner. I told her at this time I will be denying the claim. That the IW went to the ER at DMGH and did not indicate that he was having any back problems. I still need the notes form Dr. Horner. She does agree with the denial. I told her that I will send out the denials today." *Id*. Approximately one minute after Beerbower's entry regarding her conversation with Michelle, she made another entry regarding "Phone Call with Lisa." Therein, Beerbower stated: "I called and talked with Lisa. She states Dr. Horner is very slow with regards to authorizing the release of the medical records. I told her that I requested the medical 2 months ago and then again last month and still have not rec[eived] the notes. I told her that we need to get the notes ASAP. She states she will see what she can do." *Id*. A mere three minutes later, despite not having the medical records from Dr. Horner, Beerbower entered into the claim notes: "Claim is Denied. IW has not overcome the burden of proof. IW had indicated that he had went to DMGH ER for his back, however nothing in the ER notes indicates this. Also IW had treated for his back about 3-5 days prior to the alleged incident. I also talked with the gentleman that was suppose[d] to have witnessed the injury. He did not confirm that this IW had hurt his back. He also stated that the IW did not tell him that he had hurt his back at work." *Id*. at 318-19. The same day, Beerbower sent the following letter to Plaintiff:

> This letter is being sent to you in regard to our recent receipt of your worker compensation claim with a date of loss of 06/01/1999.  Our investigation has been completed and, at this time, we must respectfully deny your claim based on the information we received.  The medical records do not support your alleged injury.

Joint App. at 54.

### B.  *Information Received after August 3, 1999*

On approximately August 6, 1999, CSS received a copy of Dr. Horner's records pertaining to Plaintiff.  Defs.' Statement of Undisputed Facts at ¶ 62.  These records do not appear to have been entered into CSS's claim notes, but demonstrate a history of care dating back to July 8, 1997.  Joint App. at 59.  References in Dr. Horner's notes reflect Plaintiff's ongoing problems with his back.  *See id*. at 59 ("Lo back & abd. pain" dated 07/08/97); 57 ("Back is stable–periodic examinations of severe pain . . . ." dated 10/27/97); 84 (note dated 2/16/98 identifying "low back pain–chronic"); 96 (dated 2/22/99 "c/o back pain, upper/lower").  In an August 27, 1999 report,[10] Dr. Horner wrote:

> The patient reports that he bent over to chase some papers on June 1, 1999 about 9:10 in the morning on 8th Street outside his home office.  He was trying to pick up some of the company's confidential memos, apparently some QA type forms.  These were previously in a binder folder.  The patient was plugging a parking meter with quarters when he looked up and saw the papers flying up the street.  Previously they were in the back seat of his car in a binder.  Another employee or co-worker was apparently getting these papers out of the car.  Paper hit his leg.  The patient picked this up, saw that it was confidential, and went in pursuit of the other papers.  When bending over to pick these up he noticed the feeling of something ripping or tearing in his left lower back.  He had to leave work later that morning, about 10 o'clock, due to the pain in his back.  The next day he went to the Des Moines General emergency room where I saw and evaluated him."

---

[10]  While some of Dr. Horner's records were received by Defendants on August 6, 1999, others generated after that date clearly must have been received at a later time.  There is, however, no documentation in the record as to when Defendants received additional records from Dr. Horner.

*Id.* at 740-41. A report dated September 7, 1999, by Dr. Horner states: "As I recall, the patient's presenting complaints included severe back pain and problems with dermatologic lesion." *Id.* at 742. On that date, Dr. Horner noted that Plaintiff's back was stable, and that "periodic examinations of severe pain" were in order. *Id.* Dr. Horner also noted in her records that she was treating Plaintiff for stress-related symptoms as early as 1987. *Id.* at 116 (Arbitration Decision). Beerbower admitted during her deposition that she did not re-open Plaintiff's claim to determine if Dr. Horner's records affected her basis for denying the claim. Pl.'s Statement of Undisputed Facts ¶ 31. Defendants maintain that Dr. Horner's records would have made no difference in the denial of the claim.

Subsequent to the denial letter of August 3, 1999, Defendants also received records from Dr. Leth,[11] who noted that on July 12, 1999, Plaintiff was seen "with mechanical left-sided low back pain. He also had a fairly graphic presentation of a manic type mental illness." Joint App. at 51. Dr. Leth saw Plaintiff again on August 3, 1999, and again noted that Plaintiff was suffering from "continued back pain," but that he "continues to show signs of significant mental illness, which appear to be impairing his ability to improve symptomatically . . . his mental illness appears to be prominent." *Id.* at 53. On that date, Dr. Leth stated: "My recommendation continues to be if the patient would like his pain treated then state-of-the-art approach is radiofrequency denervation." *Id.* 52. On September 28, 1999, Dr. Leth stated that the "overwhelming finding in our office for his medical evaluation was that of severe mental illness and delusional and paranoid thoughts."

---

[11] Again, it is unclear *when* Defendants received additional documentation between August 3, 1999, the date of the initial denial of Plaintiff's claim, and the reevaluation of Plaintiff's claim made in June 2000.

-13-

On April 3, 2000, Plaintiff contacted Chris Crawford, CSS Unit Manager, via e-mail to request "a copy of all documentation in regards to my two pending work comp claims." *Id*. at 106. On April 17, 2000, Plaintiff again e-mailed Crawford, stating "I have about 400 to 500 pages of medical records to send to you." *Id*. at 104. In this e-mail, Plaintiff discussed his 1988 surgery and noted that "Travelers settled out of court with me." *Id*. Plaintiff also stated:

> I have just had back surgery [on] March 3, 2000, and I am in the recover[y] phase of the operation as far as my back is concerned. Despite Dr. McGuire's statement that my back pain is all in my head, this is completely false and I have psychiatrist's medical record to back me up. Also despite Dr. McGuire's claim that there was no logical surgery for me I had to go out of town and have a neurosurgeon from New Jersey put two titanium cages between my L5 and my L4 vertebraes. My neurosurgeon has told me that now there is more spinal surgeries for me. I still have severe debilitating pain in my left leg and also it is progressing into my right as well . . . . I have depression because of my leg and back pain and continue to see a psychiatrist for these problems . . . . These are as valid claims that there can be. Please treat them as such. I do wish to settle these claims with Travelers out of court as was done back in 1988 . . . ."

*Id*. at 104-05.

Crawford noted the following in Plaintiff's claim file on May 8, 2000:

> Had a very long conversation with the IW today. He claims that all the medical records from the Des Moines Providers (all) have errors and that we should only take into consideration Dr. Giordano who IW is treating with now. Actually the IW told me that he recently received a report from Giordano and IW is asking for some corrections due to the errors in his report. All in all, our position really does not change."

Joint App. at 319. On May 17, 2000, Crawford wrote in the claim notes, "I am [going to] reopen this file. I am going through each and every medical record to evaluate this claim. May send some letters and old medical records out to Dr. Giordano." *Id*. at 320. Also on May 17, 2000, Crawford spoke with Dennis Wolloms, who was Plaintiff's supervisor on June 1, 1999. In the claim notes, Crawford noted that "[Wolloms] recalls the IW coming in on 6/1/[99] and reporting

-14-

that he was bending over to pick up papers and injured his low back.  Dennis sent the IW home

on the DOL [date of loss] due to the pain the IW was complaining about and that he was sick due

to the pain." *Id*. at 320.

Just over three hours after Crawford reopened the claim file, he noted that he had

reviewed various medical records from Drs. Horner, McGuire, Leth, Toriello, Retenmaier, Stein,

Igram, and Abbasi.  The next day Crawford noted that he had sent a causation letter to Dr.

Giordano.  Crawford testified at deposition that he is unsure whether he had Dr. Giordano's

medical records or whether he reviewed them, but found it appropriate to direct a causation letter

to him because Plaintiff had identified Dr. Giordano as the only one of his providers with

accurate information.  *Id*. at 809-10.  In his letter to Dr. Giordano, Crawford enclosed records

from Dr. Toriello, Dr. Igram, Dr. Stein, and Dr. Retenmaier.  *Id*.  Crawford wrote:

> Given all the information above, I have really only three questions and they are as
> follows:  Can you state within a reasonable degree of medical certainty that the
> cause of Mr. Zimmer's back pain and resulting surgery is directly related to the
> reported work injury on June 1, 1999?  If so, please explain your rationale.  Is it
> possible that the three falls in the three weeks prior to the May 28, 1999 office
> visit as documented by Dr. Stein could have been responsible for the increase in
> symptoms and the need for surgery?"

*Id*. at 108.

On June 5, 2000, Crawford received a causation letter from Dr. Giordano, which he

entered into the claim notes:

> Thank you very much for your letter of May 17, 2000 in which you summarized
> much of the previous history relating to Kris Zimmer.  As a physician, I can only
> go on what the patient tells me, but it is completely obvious by the well
> documented records from competent physicians, that the patient had similar
> problems with his back and legs long prior to his reported incident of June 1st.
> Therefore, I cannot say with any degree of medical certainty that the cause of Mr.
> Zimmer's back pain and resulting surgery was directly related to the reported

work injury of June 1st of 1999.  Secondly, it is certainly possible that the
increasing falls that were occurring prior to May 28, 1999, could have
exacerbated Mr. Zimmer's symptoms, which ultimately made him a surgical
candidate.

Joint App. at 111; 322.

While the claim notes do not reflect any records from Dr. Giordano, Crawford testified

that he could not recall whether he read or received any of Dr. Giordano's records, it appears that

CSS was in possession of at least some of Dr. Giordano's medical views at the time Crawford

reviewed Plaintiff's claim.  Crawford specifically stated in his letter to Dr. Giordano, "I note

from your record of January 26, 2000 that same history [of a June 1, 1999 injury] has been

reported to you."  *Id*. at 107.  Indeed, a letter to Dr. James Crouse from Dr. Giordano, dated

January 26, 2000, states the following:

As you know, this somewhat complex 39 year-old-man, has had some difficulties
with radicular pain and back pain off and on since an L5 decompressive
laminectomy in 1988.  He apparently had done relatively well until June of last
year when he was chasing some papers down a street and then noted sharp pain in
his left buttocks radiating down to his left leg and left lateral foot . . . .  Since this
recent injury in June, he has noted left leg weakness with some pressure feeling in
his buttock.  The pain is increased by walking or sitting.  He has had the leg fall
out from under him.  He reports that the pain could be relieved by suspending
himself up from his hands on a chair, thereby taking the pressure off of his
buttocks.  Dr. John Halloran performed a left SI joint injection last week with
some temporary relief.  A CT scan was done one week ago and an MRI was done
in March of 1999 . . . .

Physical exam in our office today was somewhat remarkable.  The patient had
some tenderness over his SI joint on the left.  He had the positive straight leg raise
on the right at approximately 45 degrees and give-way pain on the left at
approximately 30 degrees.  The patient was shaky and somewhat nervous in the
office . . . .

I reviewed the large amount of x-rays, CT scans, and the MRI that came with Mr.
Zimmer.  I also reviewed a large amount of doctors notes and referral letters on
his behalf.  There has been some difficulty with relationships at his work place in

-16-

addition to all of his pain.  There has been recommendations made for
psychological evaluations.  At this time, after reviewing his MRI, I do not feel
that scar tissue, per se is a lot of problem for him.  His nerve roots appear free in
the lateral recesses.  However, on lateral views of both plain x-rays and MRI, the
S1 neural foramen is almost nonexistent.  He has degeneration of the L5-S1 disc
which is the likely cause for this.  The lateral fusion which was placed in 1988
may have had a pseudoarthrosis that moved when the patient had his accident in
June of this year.  At any rate, the patient does appear to be in a significant
amount of discomfort and I would like to pursue any final salvage operations
before recommending him a spinal cord stimulator.  I am going to obtain a CT
myelogram and place the patient in an LSO brace.  We discussed anterior lumbar
interbody fusion as a possible salvage for him.

*Id*. at 758.

In a report dated February 9, 2000, and addressed to Dr. Horner, Dr. Giordano states:

"Mr. Zimmer . . . carries a diagnosis essentially of failed back surgery syndrome.  Since last

seeing him I obtained a CT myelogram."  Joint App. at 761.  "The CT myelogram basically

reveals that there is some fibrosis adjacent to the left S1 nerve root and thecal sac.  There is also

incomplete filling of this nerve root which is evidence of foraminal stenosis, which I believe is

secondary to degeneration of the L5, S1 disc."  *Id*.  Dr. Giordano then recounts his discussion

with Plaintiff about anterior lumbar interbody fusion, and states that Plaintiff understands the

procedure and wishes to proceed.  *Id*. at 761-62.  Dr. Giordano then states he will be sending

Plaintiff to Dr. Tony Otoadese, a surgeon.  *Id*. at 762.

Dr. Otoadese, in a report dated February 22, 2000, recounts Plaintiff's history, noting that

he continued to have mild to moderate low back pain following his laminectomy in 1988.  *Id*. at

763.  "Unfortunately, in June, 1999 he re-injured his back.  Since then, he has been in severe pain

. . . ."  Dr. Otoadese reports that he will be assisting Dr. Giordano in "an anterior approach to the

lumbar laminectomy."  *Id*.  Plaintiff had the recommended surgery on March 3, 2000.  *Id*. at 768.

The day after receiving Dr. Giordano's causation letter, Crawford wrote in the claim notes that, "given my review and the new report from Dr. Giordano, I am going to stand on the denial of this claim.  I will forward a letter to the IW."  Joint App. at 322.  Crawford noted the same day that he anticipated litigation on the matter soon.  *Id.* at 323.  Crawford closed the file on August 10, 2000.  *Id.*  It is undisputed that neither Beerbower nor Crawford ever investigated or determined whether or not Plaintiff suffered a cumulative injury or a material aggravation of a preexisting condition regarding the June 1, 1999 injury, or the possibility that the June 1, 1999 injury exacerbated Plaintiff's psychological problems.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if the dispute over it might affect the outcome of the suit under the governing law.  *Id.*  The moving party has the burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson,* 477 U.S. at 248.  In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions.  *See Celotex,* 477 U.S. at 323.  Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, or admissions on file, designate the specific facts showing that there is a genuine issue for trial.  *See Fed. R. Civ. P.

56(e); *Celotex Corp.,* 477 U.S. at 322-23; *Anderson,* 477 U.S. at 257.   In order to survive a motion for summary judgment, the nonmoving party must present sufficient evidence for a reasonable trier of fact to return a verdict in his or her favor.  *Celotex Corp.*, 477 U.S. at 322-23. On a motion for summary judgment, a court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir. 1990) (citing *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990)).  A court does not weigh the evidence or make credibility determinations.  *See Anderson,* 477 U.S. at 252.  A court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material.  *Id.*

In the present case, both sides have moved for summary judgment on the Plaintiff's claims.  Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial.   Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994).   In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial.  *See id.*  (citing *Anderson*, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2712 (3d ed. 1998)).   The parties then share the burden of identifying the evidence that will facilitate this assessment.  *Waldridge*, 24 F.3d at 921.

Neither does filing cross motions for summary judgment mean the parties have waived

their right to trial.  *See Wermager v. Cormorant Township Bd.*,  716 F.2d 1211, 1214 (8th Cir.

1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that

there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary

determination on the merits.") (citations omitted).  Rather, for the purposes of summary judgment,

a party concedes there are no factual issues and accepts the other party's allegations only for the

purpose of their own motion.  *See Federal Practice and Procedure* § 2720; *see also Metro. Life*

*Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (reviewing the record with "all

inferences in favor of the party against whom the motion under consideration is made") (citing

*Herdricks-Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir. 1998)).  "Cross motions simply

require [a court] to determine whether either of the parties deserves judgment as a matter of law

on facts that are not disputed."  *Barnes v. Fleet Nat. Bank*,  370 F.3d 164, 170 (1st Cir. 2004)

(quoting *Wrightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996)).   In this

matter, then, each motion will be "evaluated independently to determine whether there exists a

genuine dispute of material fact and whether the movant is entitled to judgment as a matter of

law."  *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

Nevertheless, "[s]ummary judgments in favor of parties who have the burden of proof are rare,

and rightly so."  *Turner v. Ferguson*,  149 F.3d 821, 824 (8th Cir. 1998).

## III.  LAW AND ANALYSIS

### A.  *Statute of Limitations*

Defendants first contend that "each and every [one] of the Plaintiff's claims is barred by

the statute of limitations."  Defs.' Br. in Support of Mot. for Summ. J. at 3.  It appears that

Defendants' argument in this regard stems from some confusion amongst the parties, arising from

the underlying Workers' Compensation case.  Plaintiff first presented a claim for a back injury to

Defendants on June 1 or 2, 1999,[12] when he reported injuring his back to his supervisor, Dennis

Wollums.  That claim was denied on August 3, 1999, and again on June 6, 2000.  On August 5,

1999, a second workers' compensation claim was presented to Defendants regarding Zimmer, this

time for job-related stress with a date of loss or injury of October 16, 1997.  This claim was

denied on August 20, 1999.  Then, in his Petition for Arbitration, Plaintiff presented a third date

of injury, January 4, 1999.  In the Arbitration Decision in the underlying workers' compensation

case, the Deputy Workers' Compensation Commissioner dismissed Plaintiff's January 4, 1999

claim as barred by the statute of limitations.  Despite this conclusion, the Deputy Commissioner

found that Plaintiff was entitled to benefits for his June 1, 1999 injury,[13] a determination that was

affirmed on appeal to the Commissioner, and again on appeal to the Polk County District Court.

Plaintiff, in his resistance, clarifies the dispute to some extent.  He states that, consistent

with the Complaint in this matter, Plaintiff is only seeking to hold Defendants liable for bad faith

denial of a workers' compensation claim as regarding the June 1, 1999 date of injury.  Plaintiff

clearly states that he is not seeking damages for bad faith in regards to the January 4, 1999 date of

---

[12] In some portions of the record, it is claimed that Plaintiff told his supervisor of his injury and went home on June 1, 1999.  In other portions, it is claimed that he told his supervisor the following day.  The distinction is not relevant for purposes of consideration of the present motions.

[13] Defendants are clearly unhappy with the conclusions of the Deputy Commissioner, despite the affirmance of those conclusions on two appeals.  Defendants argue that "the Deputy Commissioner ignored the clear verbiage of [] Zimmer's Petition for Arbitration in favor of creating a scheme by which Zimmer would ultimately recover statutory benefits."  Defs.' Br. in Support of Mot. for Summ. J. at 6. Defendants also claim that the Deputy Commissioner "found a way to ensure that Zimmer received the full complement of statutory benefits," exercised "creativity" and "determined to avoid the bar of the statute of limitations . . . ."  *Id.* at 6-7.

injury, or the October 16, 1997 date of injury.  While Plaintiff urges that these claims may well be

relevant to the determination of whether Defendants acted in bad faith regarding the June 1, 1999

injury, it seems clear that neither of those matters are relevant to the present motions for summary

judgment but, rather, are evidentiary issues best decided at or near the time of trial.

A first party bad faith claim must be filed within five years of the date of denial by the

workers' compensation carrier of the claim.  *See Brown v. Liberty Mut. Ins. Co.*, 513 N.W.2d 762,

764-65 (Iowa 1994).   Defendants concede that Plaintiff filed his petition well within the five year

statute of limitation regarding the June 1, 1999 claim,[14] but urge that the claim was only for

physical injury, and not for any mental injuries, even though the Plaintiff did recover benefits for

mental injuries arising from the June 1, 1999 claim in the Workers' Compensation Arbitration.

---

[14] Defendants place a great deal of significance on the fact that Plaintiff's Workers'
Compensation Petition listed the Injury Date as 01/04/99.  Joint App. at 112.  Directly below the
injury date on the Petition, however, in a box labeled, "How did the injury occur?," Plaintiff
wrote "cumulation of stress from workplace and several incidents of hurting back at work.  Both
problems were greatly exacerbated on 06/01/00."  *Id*.  Despite a provision in Rule 876 IAC 4.5
requiring that a separate original notice and petition be filed on account of each date of injury,
the Deputy Commissioner found that "claimant's asserting of two injury dates in the same
petition does not preclude consideration of June 1, 1999, as an alleged injury date." *Id*. at 122.
The Deputy Commissioner found that the date was not first alleged during the hearing, but was
well known to Defendants when they denied Plaintiff's workers' compensation claim on August
31, 1999, and because the Defendants had fair notice of the claim on June 1, 1999.  *Id*.  The
Deputy Commissioner also found it appropriate to alter the June 1, 2000 date alleged in the
Petition to June 1, 1999, upon motion of Plaintiff at the hearing.  *Id*. at 121.  The Appeal decision
affirmed the amendment of the date from June 1, 2000 to June 1, 1999, pointing out facts
supporting the conclusion that "Defendants can not credibly claim to have failed to recognize
that the scrivener's error of June 1, 2000, on the face of claimant's petition was an error and that
June 1, 1999, was intended."  *Id*. at 131.  Judge Romano of the Iowa District Court likewise
affirmed the Deputy Commissioner's findings, concluding that it was "evident from the record
that Zimmer suffered a work related injury on June 1, 1999. . . .  Deputy Commissioner Cramer
properly found that the date of June 1, 2000 listed on the Original Notice and Petition was
simply a scrivener's error, and Petitioners were clearly on notice of the June 1, 1999 injury date
[and] the June 1, 1999 injury date is supported by substantial evidence in the record."  *Id*. at 144.

-22-

Essentially, Defendants argue that, even though the Deputy Commissioner found that the October

1997 and January 1999 claims were barred by the statute of limitations, he nonetheless permitted

Plaintiff to recover benefits for his alleged job-related stress stemming from the barred dates of

injury in the context of the June 1, 1999, non-barred date of injury.   The Court disagrees.

The Deputy Workers' Compensation Commissioner did not award Plaintiff benefits for

any pre-June 1, 1999 mental or physical condition.  Rather, the Deputy Commissioner found that

Plaintiff had satisfied his burden of proving by a preponderance of the evidence that his June 1,

1999 injury was the proximate cause of both his worsened physical and mental condition, and

awarded benefits for Plaintiff's post-June 1, 1999 mental and physical claims.  Specifically, the

Deputy Commissioner found:

> Claimant was able to work with restrictions until June 1, 1999.  Following the June
> 1, 1999, incident claimant has not returned to work.  Clamant had an ongoing
> medical treatment that eventually resulted in surgery.  Clamant's physical and
> mental conditions were not good before the injury.  He is worse after the injury
> both from a physical and psychological standpoint.  He has chronic pain.  His
> psychiatrist does not think he can work.  The work capacity assessment showed
> that claimant was not able to work an eight-hour day.  The findings of this
> assessment were also significant that when claimant gave effort he had increased
> physiologic stress and was visibly fatigued.  When all factors are considered,
> claimant is currently permanently and totally disabled from the June 1, 1999,
> injury.

Joint App. at 128-29.  Accordingly, the Deputy Commissioner found that Defendants were on

notice that Plaintiff suffered an injury on June 1, 1999, and that the medical documentation

received by Defendants was sufficient to put them on notice that Plaintiff had suffered both a

physical and mental decline of preexisting physical and mental conditions.  "It is a

well-established principle in workmen's compensation law if a claimant had a preexisting

condition or disability, aggravated, accelerated, worsened or 'lighted up' by an injury which arose

out of and in the course of employment resulting in a disability found to exist, he would accordingly be entitled to compensation."  *Dep't of Transp. v. Van Cannon*, 459 N.W.2d 900, 904 (Iowa Ct. App. 1990) (quoting *Musselman v. Centr. Tel. Co.*, 154 N.W.2d 128, 132 (Iowa 1967)).

In sum, the Court agrees with Defendants that Plaintiff cannot claim damages for bad faith arising out of any pre-June 1, 1999 conduct by Defendants.  With regard to post-June 1, 1999 conduct, however, it is clear that Plaintiff's claim that Defendant acted in bad faith by denying him workers' compensation benefits for both his materially aggravated physical and mental condition is *not* barred by the statute of limitations.

B.  *Should Plaintiff's Claim be Barred under the Doctrines of Waiver, Estoppel, and/or Laches Because of His Failure to Pursue Penalty Benefits in the Workers' Compensation Proceedings?*

Defendants contend that Plaintiff's claim for bad faith should be barred under various equitable theories because Plaintiff did not pursue penalty benefits under the workers' compensation statute.  Iowa Code § 86.13 provides that the workers' compensation commissioner "shall award benefits in addition to those benefits payable" under the workers' compensation statute "[i]f a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse . . . ."  Iowa Code § 86.13.  Thus, "[a]ny delay without a reasonable excuse entitles the employee to penalty benefits in some amount."  *Christensen v. Snap-On Tools Corp.*, 554 N.W.2d 254, 261 (Iowa 1996).   In evaluating the appropriateness of penalty benefits under § 86.13, "[t]he focus is on whether timely payment of the benefits due was made and if not, whether there was a reasonable excuse for the failure to make timely payment of the amount owed."  *Id*. at 260.

The Iowa Supreme Court first recognized a cause of action for first party bad faith failure

to pay insurance benefits in *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) ("We

conclude it is appropriate to recognize the first-party bad faith tort to provide the insured an

adequate remedy for an insurer's wrongful conduct."). The cause of action was extended into the

area of workers' compensation in *Boylan v. American Motorists Insurance Co.*, 489 N.W.2d 742,

743 (Iowa 1992). In *Boylan*, the Iowa Supreme Court concluded:

> [I]t is unlikely that the legislature intended the penalty provision in section 86.13
> to be the sole remedy for all types of wrongful conduct by carriers with respect to
> administration of workers' compensation benefits. By its terms, [section 86.13]
> applies only to delay in commencement or termination fo benefits. It contemplates
> negligent conduct rather than the willful or reckless acts that are required to
> establish a cause of action under *Dolan*. In addition, no remedy is provided under
> section 86.13 for delay or failure to pay medical benefits.

*Boylan*, 653 N.W.2d at 744; *see also McIlravy v. North River Ins. Co.*, 653 N.W.2d 323, 329

(Iowa 2002) ("Bad faith claims are applicable to workers' compensation insurers because they

hold the discretionary power to affect the statutory rights of workers, which clearly reflects their

obligation to act in good faith in the exercise of this authority.").

Ten years after *Boylan*, the Iowa Supreme Court expounded on the possible preclusive

effect of the Commissioner's penalty benefits decision on a later-filed bad faith action. In

*McIlravy v. North River Insurance Co.*, the workers' compensation insurer refused benefits for an

injured employee and the injured employee filed a contested case proceeding with a demand for

penalty benefits under § 86.13. 653 N.W.2d at 326. The industrial commissioner awarded

workers' compensation benefits to the injured employee and assessed § 86.13 penalty benefits for

the insurer's unreasonable denial of benefits, a determination that was twice affirmed on appeal.

*Id*. The injured worker then filed a bad faith tort action against the insurer for its refusal to pay

workers' compensation benefits. *Id*. The insurer moved for summary judgment, arguing that the

injured worker's action failed as a matter of law because the compensability of his claim was

"fairly debatable." *Id*. The injured worker moved for partial summary judgment, urging that "the

element of the bad faith tort requiring him to establish the absence of a reasonable basis for

denying benefits was established as a matter of law under the doctrine of issue preclusion when

the industrial commissioner awarded penalty benefits . . . ." *Id*. The district court granted

summary judgment in favor of the insurer, finding the claim "fairly debatable" as a matter of law

and that decision was affirmed on appeal to the Iowa Court of Appeals. *Id*.

On further appeal by the injured worker, the Iowa Supreme Court found that the injured

worker's theory of issue preclusion sought "to intermingle two distinct methods by which a . . .

workers' compensation carrier may be penalized due to their delay in payment of workers'

compensation benefits." *Id*. at 328. The Court stated there exist a "number of differences

between the statutory and common law provisions under which [the injured worker] has sought

redress," the most significant being "the difference in burdens of proof placed on the parties in the

two different proceedings." *Id*. at 329. That is:

> In the administrative context, where the industrial commissioner is responsible for
> applying the provisions of section 86.13, the defendant/employer or carrier bears
> the burden of proving that its denial of benefits had a reasonable basis.
> *Christensen*, 554 N.W.2d at 260. On the other hand, in a civil case where the
> trier-of-fact is responsible for applying the common law standards of the first-party
> bad faith tort, the plaintiff/insured bears the burden of proof. *See United Fire &
> Cas. Co.*, 642 N.W.2d at 657; *Dolan*, 431 N.W.2d at 794.

*Id*. at 329-30. Accordingly, the Court found that the doctrine of issue preclusion could not be

used offensively, as the injured worker argued, because issue preclusion is inapplicable where

"[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion

with respect to the issue in the initial action than in the subsequent action; *the burden shifted to*

*his adversary*; or the adversary has a significantly heavier burden than he had in the first action."

*Id*. at 330 (citing *Heidemann v. Sweitzer*, 375 N.W.2d 665, 667-68 (Iowa 1985) (emphasis in original)).

While *McIlravy* established the rule that a penalty benefits determination cannot be used as a sword in a subsequent bad faith tort case, subsequent cases have concluded that a penalty benefits determination favorable to the insurer can be used as a shield, i.e., defensively in a subsequent bad faith tort case.  In *Gardner v. Hartford Insurance Accident & Indemnity Co.*, the Iowa Supreme Court found that issue preclusion was applicable where an employer attempted to use the industrial commissioner's findings to defend against a subsequent bad faith tort claim. *Gardner*, 659 N.W.2d 198, 203 (Iowa 2003).  In *Brcka v. St. Paul Travelers Cos., Inc.*, this Court explained the concept further:

> In the Commission proceedings, the employer bears the burden of showing that it acted in good faith, while at trial the burden shifts to the employee to show bad faith.  Accordingly, since the employee has a greater burden at trial, he may not rely on a prior Commission determination.  Conversely, since an employer has the burden of establishing good faith at the Commission level, it may use issue preclusion defensively because its burden is actually less at the trial level.

366 F. Supp. 2d 850, 857 (S.D. Iowa 2005); *see also Gilbert v. Constitution State Serv., Co.*, 101 F. Supp. 2d 782, 787-88 (S.D. Iowa 2000) (finding fact that employer established that the claim was fairly debatable at the penalty benefits stage constitutes issue preclusion as to the same issue in a bad faith tort action).

In the present case, Defendants argue that Plaintiff never pursued penalty benefits under § 86.13 in the first instance, for the purpose of avoiding the possible preclusive effect of a negative determination in the penalty benefits phase on a subsequent bad faith tort claim.  Defendants urge

the Court to find that Plaintiff's failure to pursue penalty benefits should operate as a bar on the present proceedings under general equitable principles of waiver, estoppel, or laches.[15]

1.    *Waiver.*

Defendants cite *Berger v. Iowa Dep't of Transportation*, 679 N.W.2d 636, 640 (Iowa 2005) for the proposition that "a party who fails to raise an issue in one tribunal waives that issue from being raised in another tribunal." Defs.' Br. in Support of Summ. J at 16. In *Berger*, property owners raised for the first time on appeal a claim that the district engineer for the Iowa Department of Transportation was ineligible to serve on a committee reviewing the property owner's claim that they were entitled to relocation assistance. *Berger*, 679 N.W.2d at 640-41. The Iowa Supreme Court rejected the claim on the basis that the property owners failed to raise the issue of the engineer's bias in the underlying agency proceeding, thus waiving the error on appeal. *Id*. at 641. The Court finds the waiver of error on appeal situation in *Berger* clearly distinguishable from the present situation.

In order for a party to waive the ability to raise a claim, that party must take some action indicating a clear intent to waive the issue. Under Iowa law, one is "presumed to intend the natural consequences of an act intentionally done." *Lukecart v. Swift & Co.*, 130 N.W.2d 716, 724 (Iowa 1964). While certainly Plaintiff's actions in not pursuing penalty benefits before the industrial commissioner demonstrate an intent to waive his right to receive penalty benefits under § 86.13, that waiver cannot be extrapolated into an intent to waive a bad faith tort claim, which the *McIlravy* court specifically identified as a "distinct method[]" by which an insured may

---

[15]  Defendants did not plead estoppel, waiver, or laches as affirmative defenses, as required by Federal Rule of Civil Procedure 8(c). Nonetheless, the Court will analyze the merits of each claimed defense.

pursue damages.  *McIlravy*, 653 N.W.2d at 328.

    2.    *Estoppel.*

Defendants next argue that Plaintiff's claim should be barred under a theory of estoppel by acquiescence.  This doctrine "applies where a party, knowing of an enforceable right, neglects enforcement for such a length of time that the law implies its waiver or abandonment."  *In re Estate of Warrington*, 686 N.W.2d 198, 203 (Iowa 2004) (quoting *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 272 (Iowa 2002)).  "Although this doctrine bears an 'estoppel' label, it is, in reality, a waiver theory."  *Westfield Ins. Cos. v. Econ. Fire & Cas. Co.*, 623 N.W.2d 871, 880 (Iowa 2001).  This is so because "[l]ike waiver, this doctrine focuses on the action of the individual who holds the right to determine whether it has been waived."  *Id*.

To establish estoppel by acquiescence, Defendants, as the parties asserting the defense, bear the burden of proving by clear and convincing evidence:  "(1) [Plaintiff] had 'full knowledge of his rights and the material facts'; (2) 'remain[ed] inactive for a considerable time'; and (3) act[ed] in a manner that 'lead[] [the Defendants] to believe the act [now complained of] has been approved.'" *Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005) (quoting 28 Am. Jur. 2d *Estoppel and Waiver* § 63, at 489-90 (2000)).  Defendants have not even discussed these elements in their brief in support of their motion for summary judgment, let alone established them by clear and convincing evidence.  As with Defendants' claim of waiver, the Court concludes that Plaintiff's failure to pursue penalty benefits demonstrated nothing more than an intent to abandon or waive a penalty benefits claim, and not an intent to abandon or waive his distinct right to pursue a bad faith tort claim.

Defendants also assert that judicial estoppel is applicable to prevent Plaintiff from

pursuing his bad faith claim.  "The doctrine of judicial estoppel 'prohibits a party who successfully and unequivocally asserts a position in one proceeding from asserting an inconsistent position in a subsequent proceeding.'" *Duder v. Shanks*, 689 N.W.2d 214, 220 (Iowa 2004) (quoting *Roach v. Crouch*, 524 N.W.2d 400, 403 (Iowa 1994)).  "Judicial estoppel also applies when inconsistent positions otherwise meeting the requirements of this doctrine are taken in the same proceeding." *Id*. (citing 28 Am. Jur. 2d *Estoppel and Waiver* § 74, at 498-99 (2000)).  The Court finds the doctrine of judicial estoppel wholly inapplicable to the present facts.   Indeed, Plaintiff never asserted, either successfully or unequivocally, *any* position pertaining to the reasonableness of Defendants' denials of his claim in any prior action.  "[A] fundamental feature of the doctrine of judicial estoppel is the *successful* assertion of the inconsistent position *in a prior action*.  Absent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent, misleading results exists."  *Graber v. Iowa Dist. Ct.*, 410 N.W.2d 224, 228 (Iowa 1987) (emphasis added).

     3.    *Laches.*

Defendant finally asserts laches as a doctrine that operates as a bar to Plaintiff's current claim.  "Laches is an equitable doctrine premised on unreasonable delay in asserting a right, which causes disadvantage or prejudice to another." *Garrett v. Huster*, 684 N.W.2d 250, 255 (Iowa 2004).  "The party asserting the defense has the burden to establish all the essential elements thereof by clear, convincing, and satisfactory evidence." *Id*.  "Prejudice is an essential element of laches." *Id*. (citing *State ex rel. Holleman v. Stafford*, 584 N.W.2d 242, 245 (Iowa 1998)).

Defendants make no real argument supporting the bald assertion that Plaintiff

unreasonably delayed in filing a claim of bad faith.  The workers' compensation case was heard

on December 6, 2002, and the initial arbitration decision was filed on January 22, 2003.

Defendants' appeal before the Workers' Compensation Commissioner was filed on December 31,

2003.  Judge Romano affirmed the Workers' Compensation Commissioner's findings on June 2,

2004.  Plaintiff filed the present action on June 22, 2004, and Defendant removed the action to

federal court on October 5, 2004.  Thus, well under two years passed from the date of the

workers' compensation hearing to the date of filing the present action.  Nothing about this

passage of time is inherently unreasonable.  Moreover, Plaintiff's bad faith action was timely filed

within the statute of limitations, generally precluding the assertion of laches as a defense absent

special circumstances.  *See Moser v. Thorp Sales Corp.*, 256 N.W.2d 900, 908 (Iowa 1977)

("Ordinarily laches cannot be claimed against one bringing an action within the statute of

limitations, absent some special detriment to another."); *Pap v. Pap*, 73 N.W.2d 742, 748 (Iowa

1955) ("It definitely follows that if the action is not barred by the statute of limitations no

condition of laches can be reasonably claimed.").

Even assuming that Plaintiff unreasonably delayed in filing the present action, the defense

of laches is available only where it would be inequitable to allow recovery, demonstrated by

injury or prejudice to the party against whom judgment is sought to be enforced.  *See Garrett*, 684

N.W.2d at 255; *Chicago, Rock Island and Pac. R.R. Co. v. City of Iowa City*, 288 N.W.2d 536,

541 (Iowa 1980).  Here, Defendants claim that the prejudice to them is clear:  "Had Zimmer made

a claim for § 86.13 benefits before the Commissioner and had he been unsuccessful in that regard,

these Defendants would have enjoyed the opportunity to invoke the doctrine of issue preclusion

as they did in *Gilbert v. CSSC* and *Brcka v. St. Paul Travelers* (or, perhaps to have avoided

-31-

litigation altogether."  Defs.' Br. in Support of Mot. for Summ. J. at 17.   Defendants' assertion of prejudice, however, is speculative at best.  Indeed, the alleged prejudice rests on two hypothetical preconditions, i.e., Defendants would not have suffered the alleged prejudice *if* Plaintiff had actually filed a § 86.13 claim for penalty benefits, and *if* Plaintiff had been unsuccessful in that claim.  This Court cannot find as a matter of law that Plaintiff's claim should be barred under an equitable doctrine requiring a showing of prejudice on the basis of what *might* have happened if only Plaintiff had filed a penalty benefits claim.  This is particularly true when one considers the equally plausible possibility that, had Plaintiff filed a § 86.13 claim for penalty benefits, he may have been successful in receiving those benefits, and Defendants would still be subject to the present bad faith claim.[16]

4.      *Certification.*

Essentially, each of Defendants' arguments in favor of barring Plaintiff's bad faith tort claim amount to nothing more than an attempt to convince this Court to take the unprecedented position that an injured worker must successfully obtain penalty benefits under § 86.13, or be forever prohibited from filing a bad faith tort claim in a judicial proceeding.  No Iowa law has dealt directly with the question, and hence, after hearing on the Cross Motions for Summary Judgment, Defendants filed Motion for Certification of Question of Law to the Iowa Supreme Court (Clerk's No. 108).

Both Iowa law and this Court's Local Rules permit a federal district court, on the motion

---

[16] Defendants additionally ignore the fact that had Plaintiff filed a claim for penalty benefits, the burden of proof would have been on Defendants to demonstrate that a reasonable basis for their denials of Plaintiff's claim existed, whereas, in the present case, Plaintiff bears the burden of proving that no reasonable basis for the denial of benefits existed.  This shift in burdens undermines, at least to some extent, any assertion of prejudice.

of a party or sua sponte, to certify a question of state law to the Iowa Supreme Court.  *See* Iowa

Code § 684A.1 (2005) ("The Supreme Court may answer questions of law certified to it by . . . a

United States District Court . . . if there are involved in a proceeding before it questions of law of

this state which may be determinative of the cause then pending in the certifying court and as to

which it appears to the certifying court there is no controlling precedent in the decisions of the

appellate courts of this state."); Local Rule 83.1 ("When a question of state law may be

determinative of a cause pending in this court and it appears there may be no controlling

precedent in the decisions of the appellate courts of the state, any party may file a motion to

certify the question to the highest appellate court of the state.  The court may, on such motion or

on its own motion, certify the question to the appropriate state court.").  The ultimate

determination on whether to certify a question to the state's highest court is, however, a matter

"committed to the discretion of the district court."  *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881-82

(8th Cir. 1996) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)).

      The Northern District of Iowa has articulated several factors to be considered in analyzing

whether an issue should be certified:

> A court may also consider the following factors in determining whether to certify a
> question to the state supreme court: (1) the extent to which the legal issue under
> consideration has been left unsettled by the state courts; (2) the availability of legal
> resources which would aid the court in coming to a conclusion on the legal issue;
> (3) the court's familiarity with the pertinent state law; (4) the time demands on the
> court's docket and the docket of the state supreme court; (5) the frequency that the
> legal issue in question is likely to recur; and (6) the age of the current litigation
> and the possible prejudice to the litigants which may result from certification.

*Erickson-Puttmann v. Gill*, 212 F. Supp. 2d 960, 975 n.6 (N.D. Iowa 2002) (citations omitted).

      With regard to the first three factors articulated in *Erickson-Puttmann*, the Court

concludes it has ample legal resources and sufficient familiarity with Iowa workers'

compensation laws to permit it to reach a conclusion on the legal issue posed, even to the extent

that the issue has not been explicitly addressed by Iowa courts.  Accordingly, these factors do not

weigh in favor of certification.  Nor do the remaining three factors weigh in favor of certification.

This case has already been pending before the Court for nearly two years and trial will be

rescheduled by the Magistrate Judge for a date as soon as possible, once the motions for summary

judgment are resolved.  Both this Court and the Iowa Supreme Court are undoubtedly pressed for

time to hear all matters before them, and staying the present case in favor of certification will only

serve to needlessly protract the present litigation for the purpose of resolving an issue that, given

the lack of case law, is unlikely to recur with any real frequency.  Accordingly, the Court denies

Defendants' Motion for Certification.

While no Iowa case law is directly on point, the Court concludes that the clear weight of

existing law compels a conclusion that failure to pursue penalty benefits under § 86.13 does not

preclude a common law bad faith tort action.  The Iowa Supreme Court has clearly stated that

penalty benefits and bad faith tort recovery constitute "two distinct methods by which a . . .

workers' compensation carrier may be penalized due to their delay in payment of workers'

compensation benefits."  *McIlravy*, 653 N.W.2d at 328.  In recognizing the validity of the bad

faith tort cause of action, the Iowa Supreme Court pointed out differences between the two causes

and noted that jurisdictions that have rejected the cause generally did so on the basis of the

exclusive remedy provisions of the workers' compensation statutes in those jurisdictions.  *Boylan*,

489 N.W.2d at 743.  The Iowa Supreme Court, however, found that "the exclusive remedy

provision of our workers' compensation act is applicable only to claims against the employer and

does not extend to the employer's compensation insurer." *Id*.  Thus, the *Boylan* court concluded:

> [I]t is unlikely that the legislature intended the penalty provision in section 86.13
> to be the sole remedy for all types of wrongful conduct by carriers with respect to
> administration of workers' compensation benefits. By its terms, it applies only to
> delay in commencement or termination of benefits. It contemplates negligent
> conduct rather than the willful or reckless acts that are required to establish a cause
> of action under *Dolan*. In addition, no remedy is provided under section 86.13 for
> delay or failure to pay medical benefits. Penalty provisions for mere delay in
> payment or improper termination of benefits have been held in several cases not to
> preclude a common-law action for bad faith.

*Boylan*, 489 N.W.2d at 743 (internal citations omitted); *see also Reedy v. White Consol. Indus.,
Inc.*, 503 N.W.2d 601 (Iowa 1993) (exclusive remedy provision does not bar action for bad faith
or require exhaustion of administrative remedies before bad faith claim can be litigated).

This Court can find nothing in the plain language of the Workers' Compensation Act or in
the case law since *Boylan* established the bad faith cause of action, that would indicate even a
likelihood, let alone a probability, that any requirement exists that penalty benefits must be sought
prior to a suit for bad faith.  Had the Iowa legislature intended to include a provision requiring
exhaustion of administrative remedies, i.e., pursuit of penalty benefits prior to a subsequent tort
claim, it clearly had the capacity to include such a provision in the statute.  Accordingly, the
Court declines to find that the present action is barred for failure to exhaust administrative
remedies.

## C. *Bad Faith*

Under Iowa law, an employee may sue an employer or the employer's workers'
compensation carrier for a "bad faith" refusal or delay in the payment of benefits.  *McIlravy*, 653
N.W.2d at 329.  A claim for first-party bad faith arises from "'the knowing failure to exercise an
honest and informed judgment' on the part of a defendant from whom the employee seeks

compensation due to work-related injuries." *Id.* (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 12 (Iowa 1990)). In order to prevail in a claim for bad faith, the insured party must prove by substantial evidence: "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)); *see also Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999). The first element is objective, and the second element is subjective. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005).

     1. *Fairly debatable–Defendants' Motion for Summary Judgment.*

     In considering bad faith tort cases against insurers, the Iowa Supreme Court has held that "[a] reasonable basis to deny a claim exists when the claim is fairly debatable." *See Wetherbee v. Economy Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993). Whether a claim is fairly debatable is generally a question of law. *Id.*; *see also Bellville*, 702 N.W.2d at 473. "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct." *Bellville*, 702 N.W.2d at 473. In essence, then, the "fairly debatable" test requires a plaintiff "to establish to the satisfaction of a reasonable fact finder that [the defendants'] decision . . . was not based on an honest and informed judgment." *Nassen v. Nat'l States Ins. Co.*, 494 N.W.2d 231, 236 (Iowa 1992).

     It has long been established in general first party bad faith claims that if an injured worker's claim is "fairly debatable," the court *may*, on proper motion for summary judgment, grant judgment as a matter of law in favor of the insurer. *See e.g.*, *Wetherbee*, 508 N.W.2d at 662

("Whether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law."); *Reuter v. State Farm Mut. Auto. Ins. Co., Inc.*, 469 N.W.2d 250, 254 (Iowa 1991) ("If an objectively reasonable basis for denial of a claim actually exists, the insurer, as a matter of law, cannot be held liable for bad faith.").  Defendants, however, argue that the *Bellville* case has substantially changed the law in the first party bad faith arena.  Defendants urge that prior to *Bellville*, "trial courts were free to weigh the evidence on the debatable nature of the insurance claim.  If the evidence weighed more heavily in favor of the . . . plaintiff, summary judgment could be denied . . . ."  Defs.' Br. in Support of Mot. for Summ. J. at 28.  Post-*Bellville*, however, Defendants argue that "unless this court is 'prepared to grant a directed verdict to [Zimmer] on [his claims] under the policy and to hold that reasonable minds could not disagree as to [his] entitlement to proceeds under the policy, it follows that reasonable minds could disagree about [his] entitlement to policy proceeds . . . and [Defendants] will be entitled to a directed verdict in its favor.'" *Id*. at 29 (quoting *Bellville*, 702 N.W.2d at 474).  Thus, according to Defendants, "Either Zimmer is entitled to a directed verdict or Travelers is."  *Id*.  In support of this proposition, Defendants rely on the following passage from *Bellville*:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. That is because "'[w]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.'" As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim." Thus, if it is undisputed that evidence existed creating a genuine dispute as to the negligence of an uninsured or underinsured motorist, the comparative fault of the insured, the nature and extent of the insured's injuries, or the value of the insured's damages, a court can almost always decide that the claim was fairly debatable as a matter of law. *See, e.g.*, *Sampson*, 582 N.W.2d at 152 (holding district court properly decided bad faith claim as a matter of law where nature and extent of insured's injuries were debatable); *Cent. Life Ins. Co.*, 466 N.W.2d at 263 (holding insurer entitled to judgment as a matter of law where

there was a good faith dispute on the amount of the insured's damages); *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991) (holding insurer entitled to directed verdict on bad faith claim where there was conflicting information as to who was at fault in underlying automobile accident); *Barker & Glad Article*, 30 Tort & Ins. L.J. at 57 (same).

One treatise has explained the standard this way:
[A]n insurer is innocent of bad faith as a matter of law . . . if the insurer took a position in regard to the claim that reasonable minds could hold. Unless the trial court is prepared to grant a directed verdict to the insured on his claim under the policy and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds. Therefore, the insurer should be entitled to a directed verdict in its favor on the insured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim. Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5-17 to 5-18 (2d ed. 1997) (also discussing exceptions to this rule, none of which are implicated here) [hereinafter "Bad Faith Actions"]; *accord Reuter*, 469 N.W.2d at 254 (noting that existence of submissible jury question on insured's entitlement to policy benefits will generally, though not automatically, establish that the issue is fairly debatable).

*Bellville*, 702 N.W.2d at 473-74 (some citations omitted).

Defendants have made precisely the same argument regarding *Bellville's* impact on Iowa law in at least two cases recently heard in the Northern District of Iowa.  In the first, *Niver v. Travelers Indemnity Company of Illinois*, 412 F. Supp. 2d 966 (N.D. Iowa 2006), Chief Judge Bennett found the argument without merit.  *Id.* at 978.  "In the *Bellville* decision, there is no signal—indeed, there is not the merest hint—that the Iowa Supreme Court intended to modify Iowa law or to rejects its prior formulations of the requirements for the first element of a bad faith claim."  *Id.*  Further, Chief Judge Bennett found, the Iowa court's citation with approval of *Reuter* undermined the defendants' claim that *Bellville* established a new "directed verdict rule."  In *Reuter*, the high court stated:  "We do not agree that the mere denial of a plaintiff's motion for a directed verdict automatically establishes that the issue is 'fairly debatable.'  The trial court

-38-

should carefully review the facts and the particular circumstances in making its determination as to what is the precise issue or issues that are debatable." *Reuter*, 469 N.W.2d at 254.

A subsequent opinion by Judge Reade of the Northern District of Iowa, *Etten v. U.S. Food Service, Inc.*, Case No. 05-cv-83-lrr, 2006 WL 2246399 (N.D. Iowa Aug. 4, 2006), reached the same conclusion as *Niver*:

> The court does not read *Bellville* as broadly as Defendants suggest. Nowhere in *Bellville* did the Iowa Supreme Court announce that it was adopting a general directed verdict rule. To the contrary, the Iowa Supreme Court rejected the general directed verdict rule in *Reuter v. State Farm Mutual Automobile Insurance Co.*, 469 N.W.2d 250, 253 (Iowa 1991). *See Reuter*, 469 N.W.2d at 254 ("We do not agree that the mere denial of a plaintiff's motion for directed verdict [on the policy claim] automatically establishes that the issue is 'fairly debatable.'"). *Bellville* did not expressly overrule *Reuter*; indeed, *Bellville* cited *Reuter* with approval on other grounds. Moreover, in *Wilson*, 714 N.W.2d at 262, a post-*Bellville* bad faith case, the Iowa Supreme Court did not mention such a sea-change in Iowa law.
>
> Nor does *Niver* support Defendants' claim that *Bellville* adopted a general directed verdict rule. *Niver*, which the court notes is not controlling authority, rejected this very same argument for many of the same reasons noted above. *See Niver*, 412 F. Supp. 2d at 982. Accordingly, the court analyzes this case according to the traditional standards stated by the Iowa Supreme Court, not a "general directed verdict rule."

*Etten*, 2006 WL 2246399 at *5 n.5 (some citations omitted). While the authority in *Niver* and *Etten* is not binding or precedential, this Court finds it persuasive in concluding that *Bellville* made no dramatic change to Iowa law as Defendants contend. Indeed, the Court finds it likely that had the Iowa Supreme Court intended such a sweeping change, it would have made the change explicitly, as the effect of Defendants' interpretation would be to virtually exclude the possibility of trial by jury in every first party bad faith tort claim. Accordingly, the Court turns to the analysis of whether, as a matter of law, Plaintiff's workers' compensation claim was fairly

debatable such that Defendants should be entitled to summary judgment.

The first point of contention between the parties on the objective element of Plaintiff's bad faith claim, is whether Plaintiff's claim for benefits stemming from his June 1, 1999 injury was "fairly debatable" at the time Defendants denied the claim on August 3, 1999.  In her denial, claims adjustor Tina Beerbower stated, "Claim is denied.  IW has not overcome the burden of proof.  IW had indicated that he had went to DMGH ER for his back, however nothing in the ER notes indicates this.  Also IW had treated for his back about 3-5 days prior to the alleged incident.  I also talked with the gentleman that was suppose[d] to have witnessed the incident.  He did not confirm that this IW had hurt his back at work."  Joint App. at 319.  At the time Beerbower made this determination, she was aware that Plaintiff had told his supervisor, Dennis Wollums, that he hurt his back, and that Wollums had stated "he walks like he does any other time he has a bad back."  *Id.* at 309.  Beerbower had also spoken with Plaintiff himself, and noted in the claim notes that Plaintiff told her he has suffered from "continued back pain," but "that his back is really hurting him now."  *Id.* at 310.  Beerbower also wrote that Plaintiff "kept saying over and over that this was the final straw that broke the camel's back."  *Id.*  On June 11, 1999, Beerbower contacted Tim Enos, who confirmed he had witnessed Plaintiff picking up papers blowing around, but that Plaintiff "did not inform him that he had hurt his back."  *Id.* at 311.  Beerbower had also collected the following medical records:

(1)     Dr. McGuire's March 24, 1999 report, stating that Plaintiff's MRI was "pretty reasonable looking," but that Plaintiff had suffered a "recent worsening of back and leg complaints, etiology unknown."

(2)     Dr. Igram's May 17, 1999 report, articulating Plaintiff's back problems and

surgical history;

(3)    Dr. Stein's May 28, 1999 report noting that Plaintiff "is being seen today for chronic low back and leg pain."  Dr. Stein also stated that Plaintiff's "gait was a little bizarre," "the MRI shows some degenerative disease at the L-5 S-1 level," and his belief that "a lot of his problems are more on an emotional basis than on a physical basis";

(4)    Dr. Abbasi's Emergency Room notes from DMGH stating under "past medical history" that Plaintiff "is remarkable for back problems."  Dr. Abbasi stated that Plaintiff complained of discoloration and tingling in his fingers, but "denied any falls or injury . . . .  He does complain of back pain, which is chronic in nature."  Dr. Abbasi also stated that he notified Dr. Horner and she "present[ed] to the Emergency Room to assume care of" Plaintiff;

(5)    Dr. Retenmaier's notes, dated June 3, 1999, stating that Plaintiff was seen on referral from Dr. Horner for "evaluation [of a] variety of pain issues" that had improved since his surgery, but developed into "some other pain issues" about 2 ½ years before, including "progressive worsening" since January 1999.  " He talks about low back pain that has been unmanageable.  In the past, it has always been manage[able], but has subsequently been unmanageable . . . ."  Plaintiff appeared "anxious" at his exam with Dr. Retenmaier; "he had great difficulty bearing weight on his left leg . . . .  He did appear to move to the right side to take weight off his left side.  He obviously had difficulty getting up to the exam table.  I had to help him.  He hobbles on his left leg.  He has difficulty weight bearing from what

presumed to be his pain . . . .  He has no classic findings of full blown dystrophy in

the sense of swollen, edematous phase hands and touch-me-not type symptoms. . .

.  He could not stand on his tiptoes.  How much was pain and giveaway weakness,

I could not tell.  He had somewhat of a forward hunched appearance . . . . "  Dr.

Retenmaier stated his belief that Plaintiff suffered from "Chronic Pain Syndrome"

and suggested "it would certainly be reasonable to pursue studies such as a three

phase bone scan and EMG and nerve conduction velocities of his left arm and left

leg. . . ."; and

(6)     Dr. McGuire's June 14, 1999 report stating that Plaintiff "had an incident

approximately 6/1/99" and that "his pain is [now] worse."  Dr. McGuire noted that

Plaintiff "gets up with real difficulty . . . his spine is almost kyphotic in the lumbar

spine, he moves about the room in a very awkward manner."  Dr. McGuire stated

that "as far as the back is concerned he could be working.  The psychological

problems and the job conflict situation would probably prevent him from

working."

Beerbower admits that she did not have any notes from Dr. Horner, Plaintiff's primary

treating physician, either regarding his underlying back or emotional problems, or from the

emergency room visit following the June 1, 1999 injury.  Beerbower also admits that she did not

analyze Plaintiff's claim as one for material aggravation of a pre-existing injury or for the

possibility of any mental health claims.  Rather, she examined the submission of Plaintiff's

workers' compensation claim strictly as one for a "new injury."  Beerbower also admits that,

though she had asked for a causation letter from Dr. McGuire, she had not received one on the

date Plaintiff's claim was first denied.

Defendants tirelessly argue that there can be no liability in this case because Plaintiff "never tendered his workers' compensation claim as a material aggravation of a pre-existing condition . . . .  When Plaintiff Zimmer submitted his 06/01/99 DOL claim, he submitted it as a new injury."  Defs.' Resistance to Pl.'s Mot. for Partial Summ. J. at 2.  The Court finds this position untenable.  "It is a well-established principle in workmen's compensation law if a claimant had a preexisting condition or disability, aggravated, accelerated, worsened or 'lighted up' by an injury which arose out of and in the course of employment resulting in a disability found to exist, he would accordingly be entitled to compensation."  *Van Cannon*, 459 N.W.2d at 904 (quoting *Musselman*, 154 N.W.2d at 132).  As a result, if a work related illness or injury aggravates a preexisting condition rendering the condition disabling, the employer is liable for the disability.  *See Dolan*, 431 N.W.2d at 794.

Iowa law provides quite simply that an injured employee must give notice to his employer within ninety days of the date of injury, "[u]nless the employer or the employer's representative shall have actual knowledge of the occurrence of an injury received within ninety days from the date of the occurrence of the injury."  Iowa Code § 85.23.  "No particular form of notice shall be required," and the form of notice is nonmaterial if it is "sufficient to advise the employer that a certain employee, by name, received an injury in the course of employment on or about a specified time, at or near a certain place."  Iowa Code § 85.24.  There can be no doubt that Plaintiff reported the June 1, 1999 injury to his supervisor, Dennis Wollums, who turned it in to the employer's workers' compensation carrier, which carrier promptly opened a claims file.

Here, a reasonable jury could easily conclude that Defendants had ample information to

-43-

put them on notice that Plaintiff may well be making a material aggravation claim in regard to his injured back.   Defendants were well aware that Plaintiff had suffered ongoing back problems since at least 1988, and had even treated for his back problems a few days prior to the June 1, 1999 injury.  Indeed, in his interview with Beerbower, Plaintiff repeatedly told her that this was "the straw the broke the camel's back."  Defendants offer no support, legal or otherwise, for their unprecedented contention that Plaintiff bore some affirmative duty to state, "I, Kris Zimmer, am making a claim for material aggravation of a preexisting injury."   Likewise, medical evidence before June 1, 1999, and after June 1, 1999, could reasonably be said to have revealed that Plaintiff's mental condition deteriorated substantially following the June 1, 1999 injury.  A reasonable jury could conclude that Defendants acted unreasonably in failing to investigate whether Plaintiff's mental and emotional problems were exacerbated by his injury on June 1, 1999.  "The onus is not on the injured worker to guess right about the basis on which his workers compensation claim might be paid; rather, the onus is on the workers compensation insurer to 'act reasonably in regard to benefit payments [even] in the absence of specific direction by the commissioner.'" *Niver*, 412 F. Supp.2d at 989 (quoting *Boylan*, 489 N.W.2d at 743; other citations omitted).

Plaintiff "tendered" an injury claim to his employer, triggering a duty by the workers' compensation carrier to act reasonably in regards to his claim.  The duty to act reasonably is an affirmative one, and "includes the duty to fully and fairly investigate a claim rather than to stand back and deny a claim simply because they wish to deny it."  *See Pickering v. Squealer Feeds*, Case No. 99-0295, 2000 WL 961920 at *8 (Iowa Ct. App. July 12, 2000) (citation omitted).  On the record now before it, the Court cannot say as a matter of law that Defendants fully and fairly

-44-

investigated Plaintiff's claims when they ignored viable bases upon which Plaintiff could legally be entitled to benefits.  Add to this the fact that Defendants did not have in its possession all relevant documents, most notably Dr. Horner's medical records regarding Plaintiff's emergency room visit, and it is clear that the Court cannot say as a matter of law that Plaintiff's claim was fairly debatable at the time Defendants denied it on August 3, 1999, or at other times of denial later in the parties' interactions.

Even assuming, however, that the compensability of Plaintiff's claim was fairly debatable on August 3, 1999, there are clearly additional factual questions regarding the "fairly debatable" status of Plaintiff's claim later in time.  While a claim may be fairly debatable at one point in time, if the insurer becomes aware at a later date that the claim is no longer fairly debatable, liability for bad faith may still be imposed.  *See Squealer Feeds v. Pickering*, 530 N.W.2d 678, 683 (Iowa 1995) ("In other words, a continued delay in payment may be unreasonable even though the original denial was no t. . . .  Any documents showing new information coming to the attention of [the insurer] after its denial would be relevant to whether it was reasonable for the company to persist in its denial of benefits."); *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991) ("The more difficult question is whether, at some later date, [the insurer] became aware there was no reasonable basis to continue denying plaintiffs' claim . . . .").

In the present case, Defendants received Dr. Horner's notes of Plaintiff's emergency room visit on August 20, 1999.  Beerbower did not enter Dr. Horner's notes into the claim system and did not re-open Plaintiff's file to determine if Dr. Horner's records made continued denial appropriate.  Indeed, Dr. Horner's records showed that Plaintiff was taken off work indefinitely, was told to consult with various doctors, and noted that Plaintiff's back pain was severe since the

time of his emergency room visit.  Contrary to Defendants' assertion that "nothing in Dr.

Horner's records causally connected the back pain to a June 1 incident," Dr. Horner's July 27,

1999 appointment notes discuss the June 1, 1999 injury and recount that Plaintiff "had to leave

work later that morning . . . due to the pain in his back.  The next day he went to the Des Moines

General emergency room where I saw and evaluated him."  Despite this information, Beerbower

made no further effort to clarify whether Plaintiff's back injury on June 1, 1999 caused his

complaints or materially exacerbated his preexisting back or emotional problems.

Plaintiff also contacted Defendants on May 16, 2000, regarding the continued denial of his

claim, and Chris Crawford of CSS reopened the case, stating, "I am going through each and every

medical record to evaluate this claim."  Joint App. at 320.  Crawford spoke with Wollums, who

verified that after the June 1, 1999 incident, Plaintiff complained of injury to his back and was

sent home because he was "sick due to the pain."  *Id*.  It is unclear whether Crawford actually

reviewed *all* of Plaintiff's medical records, as the claim notes reference only notes from Drs.

Horner, Leth, Toriello, Retenmaier, McGuire, Stein, Igram, and Abbasi.  It is also unclear if

Crawford paid any notice to the possibility of a material aggravation claim in regards to either

Plaintiff's physical or mental condition.  Rather, Crawford sent a letter to Dr. Giordano,

accompanied by selected medical records, requesting Dr. Giordano's opinion on causation.  In his

letter, Crawford identified that Plaintiff was claiming an injury dated June 1, 1999 and that Dr.

Giordano had noted in his January 26, 2000 records that Plaintiff had reported the incident to Dr.

Giordano.  Joint App. at 107.   Crawford enclosed records from Dr. Toriello, Dr. Igram, Dr. Stein,

and Dr. Retenmaier.  *Id*.  Crawford stated, "Given all the information above, I have really only

three questions and they are as follows:  Can you state within a reasonable degree of medical

certainty that the cause of Mr. Zimmer's back pain and resulting surgery is directly related to the reported work injury on June 1, 1999?  If so, please explain your rationale.  Is it possible that the three falls in the three weeks prior to the May 28, 1999 office visit as documented by Dr. Stein could have been responsible for the increase in symptoms and the need for surgery?"  *Id.* at 108. Dr. Giordano replied that he could not "say with any degree of medical certainty that the cause of Mr. Zimmer's back pain and resulting surgery was directly releated to the work injury of June 1st of 1999."  While Dr. Giordano did note that "it is certainly possible that the increasing falls that were occurring prior to May 28, 1999, could have exacerbated Mr. Zimmer's symptoms . . . .," no such conclusion was reached regarding the stated injury of June 1, 1999.  Indeed, Crawford did not ask Dr. Giordano whether that injury might have materially aggravated Plaintiff's back problems and made no references to Plaintiff's mental state.  Despite these omissions, Crawford relied on his own review of the records and the "causation" letter from Dr. Giordano in denying the claim.  At a minimum, the Court again finds that it cannot conclude that Plaintiff's claim was "fairly debatable" as a matter of law at the time of Crawford's June 6, 2000 denial.

2. *Fairly debatable–Plaintiff's Motion for Partial Summary Judgment.*

The Court's conclusion that Plaintiff's claim is not fairly debatable as a matter of law does not necessarily lead to a conclusion that summary judgment in favor of Plaintiff is warranted. Plaintiff bears the burden of proving that the insurer had *"no* reasonable basis for denying his claims," not just that the claims were not fairly debatable as a matter of law.  Naturally, this standard requires a higher level of proof than does resisting Defendants' motion for summary

judgment.[17]  It is possible that a jury reviewing the evidence in Defendants' possession on the

dates they denied Plaintiff's claim might find the claim to be fairly debatable.  For instance, those

medical records in Beerbower's possession on August 3, 1999, essentially did not mention the

June 1, 1999 injury as causing any of Plaintiff's problems or even exacerbating those problems.

Indeed, Dr. McGuire noted on June 14, 1999 that Plaintiff "firmly believes all his back pain is

related to stress relating from this incident at work in 1997."  Joint App. at 37, 313.  Even

assuming that Dr. Horner's records had been received on the date of the August 3, 1999 denial, it

is not necessarily clear that those records would have led to the inescapable conclusion that the

incident on June 1, 1999 contributed to a worsening of Plaintiff's problems, given the records as a

whole at that time.

     While in the context of Defendants' motion for summary judgment, it is reasonable for a

jury to conclude that Defendants had no reason to debate Plaintiff's claim when Defendants had

information that Plaintiff had prior injuries which may have been exacerbated by the June 1, 1999

injury, in the context of Plaintiff's motion for summary judgment, the same jury could reasonably

conclude that Defendants were justified in debating Plaintiff's claim when he repeatedly told

various physicians that his back problems were the result of a botched surgery in 1988 and his

emotional problems stemmed from a coma he suffered prior to the June 1, 1999 injury.  *See*

*Chadima v. Nat'l Fidelity Life Ins. Co.*, 55 F.3d 345, 350 (8th Cir. 1995) (finding that where facts

existed to support insurer's argument that denial of insured's claim was reasonable, and facts also

---

[17]  The Court is mindful of the wise words of former Chief Judge Richard Sheppard Arnold,
recited *supra* in the Court's recitation of the legal standards applicable to motions for summary
judgment: "Summary judgments in favor of parties who have the burden of proof are rare, and
rightly so."  *Turner v. Ferguson*, 149 F.3d at 824.

existed to support finding that insurer had no reasonable basis for denying the claim, genuine

issue of material fact existed making the issue proper for jury decision).[18]  Likewise, a jury could

reasonably conclude that further investigation into the material aggravation theory would not, at

every stage of the claims process, have led to a determination that the June 1, 1999 injury was

causative of Plaintiff's problems, or that the benefits decision would have been different.

     3.  *Reasonable basis–Plaintiff's Motion for Summary Judgment.*

     In examining whether a defendant knew or should have known that there was no

reasonable basis for denying a plaintiff's claim, the Court must focus "on the defendant's initial

denial as well as 'whether, at some later date, [the insurer] became aware there was no reasonable

basis to continue denying [the plaintiff's] claim.'"  *McIlvary*, 653 N.W.2d at 331 (quoting *Dirks*

*v. Farm Bureau Mut. Ins. Co*., 465 N.W.2d 857, 862 (Iowa 1991)).  Plaintiff cites *Bellville* for the

proposition that, "[a]n insurer's negligent or sub-par investigation or evaluation of a claim is

---

[18]    Summary judgment has a special place in civil litigation.  The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).  Despite its usefulness, however, the Court, as well as the litigants in this and other cases, should be wary of the "the growth of the summary judgment industry as a replacement for the civil trial."  U.S. Senior District Judge Milton I. Shadur, *Trials or Tribulations (Rule 56 Style)?*, 29 No. 2 Litigation 5 (Winter 2003).  In a thoughtful discussion of the ever-increasing decline in the percentage of cases going to trial since the Supreme Court's 1986 trilogy of Rule 56 cases (*Celotex v. Catrett*, *Anderson v. Liberty Lobby, Inc.*, and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*), Judge Shadur "speaks to what happens once discovery has been completed and, as that multidisciplinary scholar and philosopher Yogi Berra put it, 'When you come to a fork in the road, take it.'" *Id.*  "Increasingly the path that tends to be traveled after that fork is reached has become all too Pavlovian in nature:  When the close-of-discovery bell rings, the Rule 56 dog salivates." *Id.*

    Prior to filing a Rule 56 motion, any attorney would be well advised to consider the cost-benefit analysis outlined by Judge Shadur, as well as to consider that "all too often even a good-faith belief by . . . counsel that no outcome-determinative factual disputes lurk in the parties' counter-submissions may be wrong.  Remember in that regard that the law commands the court to draw all reasonable inferences in favor of the party opposing summary judgment.  As if that were not enough, remember also that judges are regrettably not infallible either (despite the judicial temptation to think otherwise), so that even a judge's mistaken belief in the existence of a material factual dispute will also result in the denial of summary judgment." *Id.*  As well, it should be borne in mind that, "if a [party] is really comfortable (and right) in its view that it should prevail on summary judgment," that party should be equally comfortable relying on the "potential for prevailing on a . . . Rule 50(a) motion at the close of the . . . case." *Id.*

relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis." *Bellville*, 702 N.W.2d at 474.  The plain language of *Bellville*, however, establishes that a faulty investigation is *relevant* to the *fact-finder's* determination, not that it is sufficient to establish the subjective element of the bad faith claim as a matter of law.  As a general matter, issues of intent are not appropriate for disposition on summary judgment, as they are inherently fact based, meaning that a jury should necessarily be the fact-finder.  "In a first-party bad faith claim, 'an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 151 (Iowa 1998) (quoting *Reuter*, 469 N.W.2d at 254-55).  As discussed *supra*, there are material factual questions regarding whether Defendant lacked an objectively reasonable basis for denial of Plaintiff's claim at various stages in the claims process.  Accordingly, the question of intent is necessarily one for a jury.

## IV.  CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment (Clerk's No. 74) is DENIED.  Defendants' Motion for Summary Judgment (Clerk's No. 72) is DENIED. Defendants' Motion for Certification of Question of Law (Clerk's No. 107) is DENIED.  The Magistrate Judge shall, as soon as practicable, arrange with the parties to schedule the above-captioned matter for any necessary pre-trial matters and for a firm trial date.

IT IS SO ORDERED

Dated this ____6th____ day of October, 2006.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT